# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>vs.<br><br>Peter Rodriguez,<br><br>              Defendant. | CV 12-01427-TUC-DCB (JR)<br><br>**REPORT AND RECOMMENDATION** |

This matter was referred to Magistrate Judge Rateau for all pretrial matters. A Motion to Suppress (Doc. 32) filed by Defendant Peter Rodriguez, in which co-defendant Rudy James Hendricks joined (Doc. 35), was heard by Magistrate Judge Rateau on October 9, 2012. Defendants Rodriguez and Hendricks were present at the hearing and were represented by counsel. The Government presented one witness, Timothy McNeil, an agent with the United States Border Patrol. The witness was examined, cross-examined, and questioned by the Court. Having considered the

matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Rodriguez's Motion be granted.

**I.      Findings of Fact**

On June 1, 2012, Border Patrol Agent McNeil was patrolling State Route 286 which runs south from State Route 86 and terminates at the international port of entry into Mexico, located in the town of Sasabe.  (Tr. 6-7.)  Between SR 86 and Sasabe, Arivaca Road connects the town of Arivaca and SR 286.  (Tr. 7-8.)  Other than a few homes and the Sasabe Store, there is little else in Sasabe.  (Tr. 28.)  The town is well-known to border patrol agents as a heavily-used human and narcotics smuggling route.  (Tr. 8 & 15.)

As he was coming onto duty that day, Agent McNeil was told by other agents, whose names he does not recall, to be on the lookout for a primer gray Chevrolet Silverado pick-up truck traveling from Arivaca to Sasabe.  The agents did not provide any other details or explain why it was suspicious.  (Tr. 19.)  In the early afternoon, Agent McNeal was parked at mile marker 1 on the west side of SR 286 and facing east when he noticed a gray Chevrolet Silverado, with two occupants, followed by a green Ford Explorer, with only a driver, traveling south toward Sasabe. (Tr. 18-19.)   The vehicles were in a 25 mile per hour zone and were traveling approximately two car lengths apart.  (Tr. 21.)

As the vehicles passed, Agent McNeil pulled out and began following the vehicles.  (Tr. 20.)  As he approached Sasabe, Agent McNeil stopped at an overlook on the road, at a pull-out known as the "Sheriff's Spot," from which he could see the

1  border boundary fence and the port of entry.  (Tr. 22-23.)  After stopping briefly, he

2  continued toward Sasabe and noticed that the Ford Explorer had parked to the left of

3  the Sasabe Store.  (Tr. 24; Exhibit 1 (photograph of store)).  Not seeing the Silverado,

4  he continued driving to the port of entry, which is located approximately ¼ of a mile

5  from the store as the crow flies, but ½ mile by the road.  (Tr. 25-26.)  At the port of

6  entry, he asked customs agents if the Silverado had travelled into Mexico, and was

7  told it had not.  (Tr. 27.)  Agent McNeil then drove back through Sasabe, where he

8  noticed a woman who appeared to be approaching the Ford Explorer which was still

9  outside the Sasabe Store, and returned to the Sheriff's Spot and waited.  (Tr. 28-29.)

10     Less than ten minutes later, Agent McNeil saw the Ford Explorer traveling out

11  of Sasabe toward him, now with two occupants, and again being followed by about

12  two car lengths by the grey Silverado.  (Tr. 30-31.)  As the vehicles passed, he pulled

13  in behind them and requested a records check on the vehicles, the results of which

14  were not suspicious.  (Tr. 31-32.)  He continued to follow the vehicles and the Ford

15  Explorer, as the speed limit increased outside of town, did not speed up and created a

16  separation between the Explorer and the Silverado.   (Tr. 32.)   Based on its

17  disappearance in Sasabe, Agent McNeil suspected that the Silverado was a load

18  vehicle and decided to pass the Explorer and pull in behind the Silverado.  (Tr. 36.)

19     After passing the Explorer, Agent McNeil followed the Silverado for

20  approximately ten miles.  (Tr. 34.)  Because he suspected the Silverado was

21  transporting illegal immigrants, Agent McNeil decided to pull it over near a common

22  operating picture camera tower which had the ability to see for miles around the area.

3

1   (Tr. 34-36.)    Marijuana was subsequently discovered in the vehicle and the

2   occupants, Defendants Rodriguez and Hendricks, were arrested.

3   **II.        Conclusions of Law**

4           Rodriguez and Hendricks move to suppress the evidence seized following the

5   stop of the vehicle in which they were traveling.  The Fourth Amendment protects

6   the right of the people to be secure in their person, houses, papers, and effects against

7   unreasonable searches and seizures.  *U.S. v. Hensley*, 469 U.S. 221, 226 (1985).  In

8   *Terry v. Ohio*, 392 U.S. 1, 88 (1968), the Supreme Court held that, consistent with

9   the Fourth Amendment, police may stop persons in the absence of probable cause

10  under limited circumstances.  The Court has held that law enforcement agents may

11  briefly stop a moving automobile to investigate a reasonable suspicion that its

12  occupants are involved in criminal activity.  *Hensley*, 469 U.S. at 226.

13          Reasonable suspicion exists when an officer is aware of specific articulable

14  facts, that, together with rational inferences drawn from them, reasonably warrant a

15  suspicion that the person to be detained has committed or is about to commit a crime.

16  *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).  The articulable facts forming

17  the basis of a reasonable suspicion must be measured against an objective

18  reasonableness standard, not by the subjective impressions of a particular officer.

19  *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir.1994).  When assessing the

20  reasonableness of the police officer's actions, the court must consider the totality of

21  the circumstances which confronted the officer at the time of the stop.  *United States*

22

4

1    *v. Sokolow*, 490 U.S. 1, 8 (1989).  In relation to stops by the border patrol, the totality

2    of circumstances may include:

> (1) characteristics of the area; (2) proximity to the border; (3) usual
> patterns of traffic and time of day; (4) previous alien or drug smuggling
> in the area; (5) behavior of the driver, including obvious attempt to
> evade officers; (6) appearance or behavior of passengers; (7) model and
> appearance of the vehicle; and, (8) officer experience.

6    *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (quoting *United*

7    *States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997)).  In this case, the Court

8    must ascertain whether the factors cited by the Government in support of the stop

9    constitute behavior that should excite the suspicion of a trained border patrol agent

10   that criminal activity is afoot.  *See United States v. Rodriquez,* 976 F.2d 592, 595 (9th

11   Cir. 1992) amended by *United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

12          In the Response to the motion to suppress and at the hearing, the Government

13   cited Agent McNeil's experience and awareness that smuggling operations are

14   common in the Sasabe area and that there is little traffic between Arivaca and Sasabe.

15   In addition to these general factors, the Government argues that the stop was also

16   supported by the report from unknown agents that a suspicious gray truck would be

17   traveling from Arivaca to Sasabe, that the Silverado appeared to be traveling in

18   tandem with the Ford Explorer, that the Silverado disappeared in Sasabe while the

19   Explorer was parked at the Sasabe Store, and that the vehicles rejoined on the way

20   out of town.  Each of these factors is considered individually and collectively.

21

22

1       **A.      Proximity to the Border and Lightly Traveled Road**

2       Agent McNeil testified that he is familiar with the area around Sasabe and that

3   his suspicions are supported by the town's proximity to the border and the history of

4   alien and drug smuggling in the area.  The cases indicate that this factor is entitled to

5   a varying degree of weight.  The Ninth Circuit stated that "[a] location or route

6   frequented by illegal immigrants, but also by many legal residents, is not

7   significantly probative to an assessment of reasonable suspicion."  *United States v.*

8   *Manzo-Jurado*, 457 F.3d 928, 936    (9th Cir. 2006).    For example, if the road

9   regularly carries alien and drug smugglers, but also carries a large volume of

10  legitimate traffic, this factor carries little weight.  *See United States v. Brignoni-*

11  *Ponce*, 422 U.S. 873, 882 (1975).  However, if the road is a remote, unpaved road

12  that is rarely traveled except when used by smugglers to avoid detection and arrest,

13  this factor would be entitled to greater consideration in the reasonable suspicion

14  calculation.  *See United States v. Arvizu*, 534 U.S. 266, 269 (2002).

15      Here, Agent McNeil's suspicions were initially raised because the Silverado

16  was being closely followed by the Explorer on a lightly traveled road.  Of course

17  there is nothing inherently suspicious about vehicles traveling on a public highway.

18  *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992).  It is also notable

19  that the road is paved  and Agent McNeil described the area as residential, with

20  ranches and single family dwellings.  That would suggest that the road was in at least

21  regular use.  No specific testimony was elicited regarding how much traffic the agent

22  had seen on the road earlier in the day, he merely described the highway as lightly

6

1    traveled.   Although there were no objective measures offered to evaluate these

2    assertions, this factor does deserve significant weight given Sasabe's proximity to the

3    border and the amount and frequency of alien and drug smuggling activity in the

4    area.

5        **B.    Tandem Driving**

6        Traveling in tandem, although not sufficient on its own to establish founded

7    suspicion, is a factor that can be considered.   *United States v. Larios-Montes*, 500

8    F.2d 941, 943-44 (9th Cir. 1974); *United States v. Montero-Camargo*, 208 F.3d 1122,

9    1139 (9th Cir. 2000) (holding that tandem driving could be given some weight in

10   evaluation of reasonable suspicion).   However, the determination that vehicles are

11   driving in tandem must be based on more than the "briefest of observations."   *United*

12   *States v. Robert L.*, 874 F.2d 701, 704 (9th Cir. 1989).   Where it is relied upon to

13   support reasonable suspicion, the evidence of tandem driving must be detailed and

14   substantial.   *See United States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th Cir. 1984)

15   (extended observation of three vehicles traveling close together, parking together and

16   then traveling again in tandem).

17       In this case, when Agent McNeil first spotted the vehicles, he was in a

18   stationary position alongside the road.   He did not specifically describe how long the

19   vehicles were within his view, but noted it was in an area just outside of Sasabe

20   where the speed was reduced to 25 miles per hour.   Presumably, as Agent McNeil

21   testified that he believed the Silverado "disappeared" in Sasabe while picking up

22   aliens, the vehicles were not loaded when they drove into town.   However, no

7

1   explanation was offered as to why the vehicles would be driving in tandem prior to

2   being loaded.

3     At no point did the vehicles make any turns or exits in tandem, they did not

4   park in tandem, and they were not driven in a manner that could be interpreted as an

5   attempt to draw the agent's attention from the Silverado.   Nevertheless, Agent

6   McNeil's interpretation of events is bolstered somewhat by the fact that the vehicles

7   came into town together and then, after separating, left together.   Thus, this factor

8   deserves some weight in the evaluation of reasonable suspicion.

9     **C.**  **The "Suspicious Truck" Report**

10     Agent McNeil testified that other agents had provided a tip about a

11   "suspicious" gray Silverado.   Such information, of course, is part of the "totality of

12   the circumstances" surrounding the stop.   *See Illinois v. Gates*, 462 U.S. 213, 238

13   (1983).   To determine whether a tip contributes to or provides reasonable suspicion,

14   the Court must consider the informant's veracity, reliability, and basis of knowledge.

15   *United States v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001).   Here, it is certainly

16   significant that the tip came from other agents as it suggests some degree of

17   reliability.   However, when asked about the basis for the tip, Agent McNeil could not

18   recall the specifics or if a basis for the tip was provided by the other agents.[1]

19   _____

20   [1] The Court notes that this case is not appropriate to the application of the "collective
21   knowledge" doctrine.   *See United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).
   No evidence was presented that the other agents had additional information that they had not
   conveyed to Agent McNeil, *see id.* at 1032-33, or that they directed Agent McNeil to
22   conduct the stop based entirely on facts known only to them, *see id.* at 1034-35.

1    Without more information, only the general identifying features of the car

2  could be corroborated by Agent McNeil.  Other than the color and make of the truck,

3  Agent McNeil did not known anything about the vehicle or its driver or why the

4  tipping agents believed it would be involved in criminal activity.  Without a "range

5  of details" that cannot simply describe easily observable facts, *id.* at 1076, the Court

6  cannot adequately examine the circumstances surrounding the tip.  Thus, the Court

7  finds that this consideration merits little weight.

8        **G.    Totality of the Circumstances**

9    As discussed above, many of the facts cited by the Government are based on

10  broad profiles that have not been shown to be particularly reliable indicators of

11  criminal activity.  *See United States v. Diaz-Jaurez*, 299 F.3d 1138 (9th Cir. 2002)

12  (noting that reasonable suspicion cannot be based on broad profiles).  These factors

13  include that the events occurred near the border in an area known for smuggling

14  activities and that the road was lightly traveled.  Given that these considerations

15  apply to every car traveling in the Sasabe area, the other considerations offered by

16  the Government are pivotal here.

17    Here, however, the remaining factors are minimally probative and cannot

18  establish the required "particularized and objective basis for suspecting the particular

19  person stopped of criminal activity."  *Rodriquez*, 976 F.2d at 594.  The evidence of

20  tandem driving is scant. The vehicles were close to one another when they entered

21  and departed Sasabe, but they did not follow each other while in town and neither

22  undertook any evasive action.   The drivers were not described as nervous or

9

1    preoccupied.  Additionally, the report of a suspicious truck did not include any

2    details and cannot be examined for its basis and veracity.  Accordingly, the factors

3    relied on by Agent McNeil, considered in their totality, are insufficient to establish

4    the reasonable, particularized suspicion necessary to support the stop in this case.

5    **III.     Recommendation for Disposition by the District Judge**

6          Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule

7    Civil 72.1, Rules of Practice of the United States District Court, District of Arizona,

8    the Magistrate Judge recommends that the District Court, after an independent review

9    of the record, GRANT the Motion to Suppress (Doc. 32) filed by Defendant Peter

10   Rodriguez, in which co-defendant Rudy James Hendricks joined (Doc. 35).

11         This Recommendation is not an order that is immediately appealable to the

12   Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),

13   Federal Rules of Appellate Procedure, should not be filed until entry of the District

14   Court's judgment.  However, the parties shall have fourteen (14) days from the date

15   of service of a copy of this recommendation within which to file specific written

16   objections with the District Court.  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a)

17   and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10)

18   days within which to file a response to the objections. No replies are permitted

19   without leave of court.  If any objections are filed, this action should be designated

20   case number: CR 12-1427-TUC-DCB.  Failure to timely file objections to any factual

21   or legal determination of the Magistrate Judge may be considered a waiver of a

22

1    party's right to de novo consideration of the issues.   *See United States v. Reyna-*

2    *Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

3              Dated this 18th day of October, 2012.

4

5

6

7                                                    Jacqueline M. Rateau
                                                     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22